Filed 2/15/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PAUL ARGENTIERI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MARK ELLIOT ZUCKERBERG et al.,<br><br>    Defendants and Respondents. | A147932<br><br>(San Francisco County<br>Super. Ct. No. CGC-15-548503) |

Paul Argentieri appeals from an order granting the motion of respondents Mark Elliot Zuckerberg, Facebook, Inc., and Colin Stretch to strike Argentieri's complaint for defamation under the anti-Strategic Lawsuit Against Public Participation (SLAPP) statute (Code Civ. Proc., § 425.16).[1] Argentieri contends the court erred in concluding that he had not demonstrated a probability of prevailing on his defamation claim.

We will affirm the order. Although the statement underlying Argentieri's defamation claim was not subject to the litigation privilege of Civil Code section 47, subdivision (b), it was subject to the fair and true reporting privilege of Civil Code section 47, subdivision (d). He therefore has no probability of prevailing on his claim.

## I. FACTS AND PROCEDURAL HISTORY

Argentieri was an attorney for Paul Ceglia throughout Ceglia's lawsuit against Facebook, Inc. (Facebook) and its founder, Mark Elliott Zuckerberg (Zuckerberg).

---

[1] The grant of a special motion to strike under Code of Civil Procedure section 425.16 is immediately appealable. (Code Civ. Proc., § 425.16, subd. (i).)

1

Ceglia's lawsuit was dismissed on the grounds that the lawsuit was a fraud on the court and Ceglia had spoliated evidence. Facebook and Zuckerberg then sued Argentieri and others for malicious prosecution and deceit, and Facebook's general counsel, Colin Stretch (Stretch), sent an email to members of the press stating that the law firms named in the malicious prosecution complaint, including Argentieri, "knew [Ceglia's lawsuit] was based on forged documents yet they pursued it anyway." After a court found that the complaint did not state a claim for malicious prosecution against certain defendants, Argentieri sued Facebook, Zuckerberg, and Stretch in the matter now before us, alleging that he was defamed by Stretch's statement. The only issue in this appeal is the trial court's dismissal of Argentieri's lawsuit under the anti-SLAPP law.

A. Ceglia's New York Lawsuit Against Facebook

In June 2010, Ceglia filed a lawsuit against Zuckerberg and Facebook in New York state court. Argentieri signed the complaint, and Ceglia verified it. The complaint alleged that Ceglia and Zuckerberg had entered into a written contract in April 2003, by which Ceglia would acquire an interest in "The Face Book" in exchange for $1,000 and certain other consideration. Pursuant to this contract, Ceglia allegedly became entitled to an 84 percent ownership interest in Facebook. Attached as an exhibit to the complaint was a document entitled " 'Work for Hire' Contract," purportedly signed by Ceglia and Zuckerberg on April 28, 2003 (Work for Hire Contract).

Upon filing the complaint, Argentieri and Ceglia obtained an ex parte temporary restraining order that prevented Facebook from transferring or selling any assets or stock in the company for about 17 days. A few days after the complaint was filed, Argentieri contacted Facebook and suggested meetings to discuss settlement. In July 2010, the case was removed to federal district court for the Western District of New York.

In 2011, Argentieri recruited other law firms to help represent Ceglia. Eventually, law firms including DLA Piper LLP (DLA Piper), Lippes Mathias Wexler Friedman LLP

2

(Lippes), and Kasowitz Benson Torres & Friedman LLP (Kasowitz), along with Argentieri, represented Ceglia in his lawsuit against Zuckerberg and Facebook.

### 1. Kasowitz Tells Argentieri The Contract Is Fraudulent

On March 30, 2011, a forensic e-discovery consultant working with Kasowitz discovered on Ceglia's computer the original contract between Ceglia and Zuckerberg attached to contemporaneous emails; the consultant concluded that the document had been altered to create the Work for Hire Contract by adding references to Facebook. Kasowitz notified Argentieri of these findings and immediately withdrew as Ceglia's counsel.

### 2. Ceglia's Amended Complaint

On April 11, 2011, Ceglia filed an amended complaint in federal court signed by DLA Piper, with co-counsel identified as Argentieri and Lippes. Like Ceglia's original complaint, his amended complaint attached a copy of the "Work for Hire Contract" and alleged that Zuckerberg had breached it. The amended complaint also quoted alleged emails between Ceglia and Zuckerberg.

### 3. Kasowitz's Letter and the Parties' Expedited Discovery

On April 13, 2011, Kasowitz sent a letter to Lippes, with a copy to Argentieri and lawyers for DLA Piper, advising that documents Kasowitz had reviewed from Ceglia's computer on March 30, 2011, "established that page 1 of the [Work for Hire Contract] is fabricated." It also noted that Kasowitz had communicated these findings to Argentieri on March 30, April 4, and April 12, 2011. Kasowitz agreed to refrain from reporting the matter to the court pending an investigation that Lippes had promised to undertake.[2]

---

[2] By letter dated June 3, 2011, Kasowitz notified Lippes that Kasowitz conferred with counsel and was advised that Kasowitz was not obligated to take further actions regarding Ceglia's pleadings. Respondents do not address this letter; appellants overstate it, urging that Kasowitz "effectively withdrew their objections to Ceglia's lawyers proceeding with his case."

3

In June 2011, the parties filed cross-motions for expedited discovery regarding the authenticity of the Work for Hire Contract. In support of Facebook's motion, Zuckerberg submitted a declaration in which he denied signing the Work for Hire Contract and set forth his own version of the events. Zuckerberg averred that, while a freshman at Harvard in early 2003, he had responded to an online job listing regarding the development of a website for a company named StreetFax. Around April 2003, Zuckerberg entered into a written contract with Ceglia, by which Zuckerberg agreed to provide limited website development services for StreetFax.com only. The StreetFax contract did not concern Facebook or any related social networking service or website—in fact, Zuckerberg had not even conceived of the idea of Facebook until months later in December 2003. Zuckerberg performed development work for StreetFax in 2003 and early 2004, although Ceglia failed to pay Zuckerberg in full for his services.

On the eve of the hearing on the motions for expedited discovery, DLA Piper and Lippes withdrew from the case without explanation, leaving Argentieri and other attorneys representing Ceglia.

A federal magistrate ordered expedited discovery into the authenticity of the Work for Hire Contract and purported emails, requiring, among other things, that Ceglia produce the original purported contract and the native electronic version by July 15, 2011.

### 4. Dismissal of Ceglia's Lawsuit

After discovery, Facebook and Zuckerberg filed a motion to dismiss Ceglia's lawsuit on the basis that the StreetFax contract was the true agreement between Zuckerberg and Ceglia, the Work for Hire Contract and alleged emails were fraudulent, and Ceglia had spoliated evidence.

In March 2013, a federal magistrate issued a 155-page Report and Recommendation, proposing that the district court exercise its inherent power to dismiss the lawsuit as a fraud on the court and due to Ceglia's spoliation. The magistrate found

4

there was clear and convincing evidence that the StreetFax contract was the "authentic contract governing the business relationship" between Ceglia and Zuckerberg. The magistrate also found that Facebook had proven, by clear and convincing evidence, "the fraudulent nature of the Work for Hire Document and the supporting emails." He further found that it was "reasonably certain that the Work for Hire Document and the supporting e-mails were fabricated for the express purpose of filing the instant action." In addition, the magistrate determined, Ceglia had "engaged in sufficient spoliation of evidence to support outright dismissal of the action." The magistrate concluded that Ceglia had created at least two distinct physical versions of the forged Work for Hire Document, "baked" the Work for Hire Contract to thwart ink analysis, and destroyed at least six USB removable storage devices containing relevant evidence.

In March 2014, the district court adopted the magistrate's "admirably well-reasoned Report and Recommendation" and dismissed Ceglia's lawsuit because the Work for Hire Contract was a fabrication and, alternatively, because of Ceglia's spoliation of evidence.

In April 2015, the Second Circuit Court of Appeals affirmed the dismissal. Noting Ceglia's "total disregard for [the] judicial system," the court concluded that "the discovery of the real StreetFax contract . . . put[] the lie to Ceglia's claim" and opined that many of the font and formatting "irregularities" in the forged document "are apparent [even] to the naked, untrained eye." The court also affirmed the dismissal on the basis of Ceglia's "extensive spoliation." [3]

---

[3]     In October 2012, during the pendency of the motion to dismiss Ceglia's amended complaint, federal agents arrested Ceglia on two felony counts for fraud allegedly committed in bringing and prosecuting his lawsuit. Ceglia was indicted, and his criminal trial was scheduled to begin in the Southern District of New York in May 2015. In March 2015, Ceglia removed his electronic monitoring device and fled house arrest. Argentieri points out, however, that the government's forensic experts were unable to ascertain whether the signature on the Work for Hire

B.  Facebook/Zuckerberg's Malicious Prosecution Action and Stretch Email

In October 2014, after Ceglia's civil case was dismissed in federal court in New York, Facebook and Zuckerberg filed a lawsuit in state court in New York against lawyers who had represented Ceglia in his lawsuit:  Argentieri and his law firm, DLA Piper, Lippes, Milberg LLP, and individual lawyers from those firms.

1.  Facebook/Zuckerberg's Allegations

The complaint asserted claims for malicious prosecution and deceit in violation of New York Judicial Law section 487.[4]  It alleged that Argentieri and the other lawyers "conspired to file and prosecute a fraudulent lawsuit against Facebook and [Zuckerberg], based on fabricated evidence, for the purpose of extorting a lucrative and unwarranted settlement."  According to the complaint, Argentieri and the other lawyers knew that the lawsuit was a fraud, yet continued to pursue it anyway.  More specifically, the complaint alleged:  "The *lawyers representing Ceglia knew or should have known that the lawsuit was a fraud*—it was brought by a convicted felon with a history of fraudulent scams, and it was based on an implausible story and *obviously forged documents*. In fact, Defendants' own co-counsel discovered the fraud, informed the other lawyers, and withdrew.  Despite all this, Defendants vigorously pursued the case in state and federal courts and in the media."  (Italics added.)

2.  Stretch's Statement Emailed to the Press

On October 20, 2014, the same day that Facebook and Zuckerberg filed their malicious prosecution action, Facebook's general counsel Stretch sent an email to members of the press, allegedly on behalf of Facebook and Zuckerberg (Statement).

Contract was a forgery.  He urges that the arrest of Ceglia was orchestrated by respondents' lawyers.

4        New York Judicial Law section 487 provides, in part: "An attorney or counselor who: [¶] 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; . . . [¶] Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

Stretch's Statement asserted: " 'We said from the beginning that Paul Ceglia's claim was a fraud and that we would seek to hold those responsible accountable. DLA Piper and *the other named law firms knew the case was based on forged documents yet they pursued it anyway*, they should be held to account.' " (Italics added.) This Statement is the basis of Argentieri's defamation action now before us.

### 3. Dismissal of Facebook/Zuckerberg's Malicious Prosecution Action

Argentieri filed an answer to the complaint and served discovery requests. The other defendants, however, filed a motion to dismiss the complaint on the ground it failed to state a cause of action for malicious prosecution or a violation of section 487 of New York's Judiciary Act. A trial judge in the New York Supreme Court denied the motion to dismiss in May 2015.

In December 2015, the New York Appellate Division unanimously reversed the trial court's ruling and ordered that Facebook's and Zuckerberg's complaint be dismissed (apparently only as to the moving law firms, not Argentieri).[5]

As to the malicious prosecution claim, the New York Appellate Division found that the allegations concerning the lawyers' lack of probable cause were conclusory and thus inadequate to state a claim, noting the authenticity of the Work for Hire Contract was vigorously contested throughout the Ceglia litigation. The court also looked to the efforts counsel undertook to ascertain the truth: "Moreover, the DLA-Lippes defendants conducted a quite thorough investigation after being advised of Kasowitz's findings, going so far as subjecting Ceglia to a polygraph test, which he passed. The Kasowitz

---

[5] The order does not specify whether the complaint was to be dismissed in its entirety, even though the motion that was the subject of the order was not brought by Argentieri. Respondents maintain that the case was not dismissed as to Argentieri. At the hearing on the anti-SLAPP motion, however, Argentieri's attorney insisted that the entire case was dismissed. It is unclear why counsel could not agree on the basic status of the lawsuit between their clients, but the debate on this point does not affect the outcome of this appeal.

7

letter alone is not sufficient to support a claim that any further representation of Ceglia was patently unsupported by probable cause."

As to the claim under the Judiciary Law, the court concluded that "the allegations that defendants knew of Ceglia's fraud are conclusory and not supported by the record." The court explained: "Although plaintiffs allege that the DLA-Lippes defendants had been advised by Kasowitz that the Work for Hire Contract was a forgery *prior* to the filing of the amended complaint in the Ceglia action on April 11, the record unequivocally shows that the Kasowitz letter to that effect was dated April 13, two days *after* the amended complaint was filed. There is nothing to indicate that this information had been communicated to the defendants prior to the issuance of that letter. Moreover, plaintiffs offer no support for their claim that defendants had actual knowledge of the fraudulent nature of the claim based on statements made to them by Ceglia. In fact, the opposite is true. As noted, Ceglia consistently maintained that the Work for Hire Contract was genuine and even passed a polygraph test covering the contract and his other claims."[6]

Facebook and Zuckerberg moved for reconsideration of the appellate division's ruling, and their motion was denied. They thereafter petitioned the New York Court of Appeals for review; according to the parties, that petition was still pending as of the time of the appellate briefing in this case.

C. This Litigation

In October 2015, Argentieri filed a "Verified Complaint for Damages for Defamation Per Se/Libel On Its Face" against Facebook, Zuckerberg, and Stretch in San Francisco Superior Court.

Argentieri's complaint asserts a single cause of action for defamation per se, based on the Statement issued by Stretch. According to the complaint, Stretch's Statement was

---

[6] Argentieri does not claim to have conducted the investigation undertaken by DLA Piper and Lippes, and the court did not make any findings regarding Argentieri's knowledge or whether a claim was stated against him specifically.

8

made "to the public and the press" and was "published worldwide about [Argentieri] and the other lawyers" who were named as defendants in the malicious prosecution action. Although Argentieri was not explicitly named in the Statement, the Statement was nonetheless made about him and was so understood by those who read it. Argentieri further alleged that the portion of the Statement representing that " 'the other named law firms [which includes Plaintiff] knew the [Ceglia Action] was based on forged documents yet they [including Plaintiff] pursued it anyway' " was untrue and defamatory on its face. In addition, Argentieri alleged that forensic scientists had concluded the Work for Hire Contract was authentic and that Ceglia had passed a polygraph test (on June 2011) indicating no deception. Attached to the complaint were copies of articles from the New York Times and Reuters including Stretch's Statement.

Respondents filed a special motion to strike Argentieri's defamation complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16). Respondents urged that Stretch's Statement was within the scope of the statute's protection, and that Argentieri could not demonstrate a probability of prevailing on his defamation claim because, inter alia, the claim was barred by the litigation privilege of Civil Code section 47, subdivision (b), and Argentieri could not prove defamation because Stretch's Statement constituted an opinion rather than an actionable statement of fact and was in any event true. Respondents did not raise the fair and true reporting privilege set forth in Civil Code section 47, subdivision (d).

Argentieri opposed the special motion to strike, contending that the Statement was not protected activity and that he could show a probability of prevailing on the merits, because the litigation privilege did not apply and the Statement was actionable and untrue. Argentieri submitted a declaration averring that he did not know or have reason to know Ceglia's documents and lawsuit were fraudulent and maintaining that the "great weight" of the evidence supports the documents' authenticity. He also presented reports from forensic document examiners and other evidence that had been submitted to the

9

New York Appellate Division, which had dismissed the malicious prosecution complaint. In addition, Argentieri filed a request for the trial court to take judicial notice of the New York court's order (which the trial court granted).

After a hearing, the trial court issued a written order on February 16, 2016, granting respondents' motion to strike Argentieri's complaint. The court concluded that Stretch's Statement constituted protected activity under the anti-SLAPP statute because it was "made in connection with an issue under consideration or review by a . . . judicial body." The court then determined that Argentieri failed to establish a probability of prevailing on the merits of his defamation claim, because (1) the litigation privilege (Civ. Code, § 47(b)) and the fair and true reporting privilege (Civ. Code, § 47(d)) applied to Stretch's Statement;[7] and (2) the part of the Statement asserting that Ceglia's counsel "should be held to account" constituted a non-actionable opinion, and the part of the Statement declaring that "[w]e said from the beginning that Paul Ceglia's claim was a fraud and that we would seek to hold those responsible accountable" could not be found to be false.

This appeal followed.

## II. DISCUSSION

Code of Civil Procedure section 425.16 (section 425.16) authorizes a defendant to file a special motion to strike when a cause of action arises from an act in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue.[8] The purpose is to curb the chilling effect that certain litigation may have on the

---

[7] The court's order seems to conflate the litigation privilege of Civil Code section 47, subdivision (b) and the fair and true reporting privilege of Civil Code section 47, subdivision (d), or treat both statutory subdivisions as part of the litigation privilege. Our analysis will address the privileges independently.

[8] In pertinent part, section 425.16 provides: "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the

10

valid exercise of free speech and petition rights, and the statute is to be interpreted broadly to accomplish that goal. (§ 425.16, subd. (a).)

There are two prongs to the analysis under the anti-SLAPP statute. First, the defendant must make a threshold showing that the plaintiff's cause of action arises from the defendant's free speech or petition activity, as specified in the statute. (§ 425.16, subds. (b) & (e).) Second, if the defendant has made that showing, the burden shifts to the plaintiff to establish, by admissible evidence, a probability of prevailing on the claim. If the plaintiff fails to do so, the motion to strike is granted and the prevailing defendant is entitled to recover his or her attorney fees and costs. (§ 425.16, subd. (c); *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1181 (*Wallace*), disapproved on another ground in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, fn. 11.)

Argentieri does not contest the trial court's finding on the first prong of the anti-SLAPP analysis—that Stretch's Statement constitutes protected activity within the meaning of the statute. The issue, therefore, is whether the court erred in concluding that Argentieri has no probability of success on the merits, either because Stretch's Statement is privileged or because it cannot be the basis of a defamation action for other reasons. We review de novo. (*Wallace, supra,* 196 Cal.App.4th at p. 1181.)

court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(1), (2).)

A. <u>Litigation Privilege: Civil Code Section 47(b)</u>

Under subdivision (b) of Civil Code section 47 (section 47), the litigation privilege protects any "publication or broadcast . . . made . . . in any . . . judicial proceeding." The privilege is absolute and precludes a claimant from establishing a probability of prevailing on the merits of his claim. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926 (*Kashian*).)

The litigation privilege generally applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).) The privilege pertains not only to statements made during a trial, but also to steps taken before trial and statements made "to achieve the objects of the litigation, even though the [statement] is made outside of the courtroom and no function of the court or its officers is invoked." (*Albertson v. Raboff* (1956) 46 Cal.2d 375, 381.) The privilege is intended to "afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently . . . . [¶] [with] protracted and costly lawsuits." (*Silberg, supra,* 50 Cal.3d at pp. 213–214.)

1. *Abraham*

The trial court in this case concluded, and respondents urge, that *Abraham v. Lancaster Community Hospital* (1990) 217 Cal.App.3d 796 (*Abraham*) indicates the litigation privilege should apply here. We disagree.

In *Abraham*, hospital LCH filed a complaint in federal court alleging antitrust violations and torts against another hospital and certain health care plans. (*Abraham, supra*, 217 Cal.App.3d at p. 801.) LCH sought leave to file a proposed amended complaint, which alleged that a hospital administrator (Abraham) was involved in the defendants' wrongdoing and named him as a defendant; the actual amended complaint that was eventually filed did not name Abraham as a party, but alleged he was a co-

12

conspirator and set forth his purported wrongdoing. (*Id*. at p. 805.) Abraham sued for defamation, on the ground he had been named as a defendant in the proposed amended complaint in which he was accused of a wide variety of unlawful and criminal acts, these allegations were caused to be "published in the local press," and they were disseminated by word of mouth "in the Antelope Valley and specifically within the medical community there." (*Id*. at pp. 805–806.)

The court in *Abraham* spent much of its analysis concluding that the litigation privilege is absolute and unaffected by whether the speaker acted with malice. (*Abraham, supra*, 217 Cal.App.3d at pp. 813–822.) It also noted that Abraham's defamation claim was based on statements clearly made in connection with the pending federal litigation and was directly related to the issues raised by the pleadings, since the statements asserted his involvement in the schemes alleged in the complaint. (*Id*. at pp. 822–823.) The court then concluded that the purported defamatory statements were covered by the litigation privilege. (*Id*. at pp. 823–824.)

As to the communication to the local newspaper, the court first noted that the publications *in* the Antelope Valley Press were undisputedly accurate reports of the contents of the federal pleadings and were thus privileged as a fair and true report of a judicial proceeding under then subdivision 4 of section 47 (now § 47, subd. (d)); based on this finding, the court held that the litigation privilege applied to the communication *to* the newspaper: "Since both the pleadings in the federal court and publication in the press of a fair and true report of the pleadings are absolutely privileged, it would defeat the purpose of [former] section 47, subdivisions 2 and 4 to punish the *transmittal of the privileged pleadings* to the press." (*Abraham, supra*, 217 Cal.App.3d at p. 823, italics added.)

As to the alleged communication of the allegations by word of mouth within the Antelope Valley and the medical community, the court in *Abraham* found the communications privileged because the local medical community possessed a substantial

13

interest in the outcome of the pending litigation and "as such were 'participants' therein," and otherwise there would be a chilling effect on the public's discussion of pending litigation. (*Abraham, supra*, 217 Cal.App.3d at p. 823.) In this context, the court observed, "[i]t would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he can be sued for defamation if he lets anyone know that he has brought it. [Citation.]" (*Id*. at pp. 823–824; but see *Shahvar v. Superior Court* (1994) 25 Cal.App.4th 653, 660–661 (*Shahvar*).)

Respondents argue that Stretch's Statement "merely echoed and summarized" the allegations of the malicious prosecution complaint and is therefore privileged under *Abraham*. But *Abraham* is not directly on point. In *Abraham*, the statement to the press was the proposed *pleading*—a "publicly available judicial document on which the press was privileged to report." (*Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 96 (*Susan A.*); see *Abraham, supra*, 217 Cal.App.3d at p. 823.) By contrast, Stretch did not merely send the malicious prosecution complaint to the press, but emailed a press release. To consider whether this makes a difference, we turn to cases decided since *Abraham*, which hold that statements to the press will generally not be privileged under section 47, subdivision (b).

2. The Press Lacks a Substantial Interest In the Subject Matter

In *Susan A., supra*, 2 Cal.App.4th 88, a psychologist interviewed a 14-year-old boy accused of attempted murder at defense counsel's request, and later made statements about the boy to the press. (*Id*. at p. 92.) The court held that the psychologist's statements to the news media were not covered by the litigation privilege, because "the privilege does not apply where publication is to persons in no way connected with the proceeding." (*Id*. at p. 93.) Noting that cases had expanded the scope of section 47, subdivision (b) to include publication to nonparties with a substantial interest in the proceeding, the court concluded that this "expansion does not encompass publication to the general public through the press." (*Id*. at p. 94.) "Such an expansion would swallow

14

up the general rule, which our Supreme Court recently reaffirmed, that section 47(b) does not privilege 'republications to nonparticipants in the action . . . .' ([*Silberg*], *supra*, 50 Cal.3d at p. 219.)" (*Ibid.*)

To similar effect is *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141 (*GetFugu*). There, the Attorney Defendants had filed, on behalf of their clients, a lawsuit alleging racketeering and other claims against GetFugu, Inc., Carl Freer, and another individual. (*Id*. at pp. 144–145.) The Attorney Defendants had also issued two written statements—a press release and a tweet—to publicize the alleged misdeeds of GetFugu, Inc., and Freer. The press release asserted, among other things, that the FBI was conducting a criminal investigation of Freer independent of the civil RICO suit. (*Id*. at pp. 145–146, 152.) The tweet, issued after the lawsuit was dismissed by the court, insisted that the racketeering suit was not frivolous. (*Id*. at p. 146.) Upon the dismissal of the racketeering complaint, GetFugu, Inc., and Freer filed a lawsuit against the Attorney Defendants for malicious prosecution and defamation based on the press release and, as later amended, the tweet. (*Id*. at p. 147.) The Attorney Defendants filed an anti-SLAPP motion to strike, contending *inter alia* that the plaintiffs had no probability of prevailing on their claims because the press release and tweet were protected by the litigation privilege. The appellate court disagreed, concluding inter alia that the statement to the press was not privileged because it was not sent to persons with a "substantial interest" in the malicious prosecution case, and the litigation privilege "does not encompass publication to the general public through the press." (*Id.* at p. 153.)

Here, Stretch's Statement was emailed to the press, not to a group with a substantial interest in the malicious prosecution case. According to respondents' memorandum in support of their anti-SLAPP motion, the Statement was released to a "targeted set of journalists who had been closely following Ceglia's fraudulent lawsuit." But the interest of these journalists arose not because the malicious prosecution case actually affected them, but because they could report the case to the public. Indeed, as

15

evinced by attachments to Argentieri's verified complaint, respondents sent the Statement to the New York Times, Reuters, and others, who in turn broadcast it to readers. And certainly that was the expectation—in fact, the goal—of Stretch's Statement: as respondents assert in their brief in this appeal, they issued the Statement to "set[] the *public* record straight" and recounted the allegations "in terms that were appropriate for a *general public audience*." (Italics added.) In short, Stretch's communication of the email to major news outlets was a publication to the general public through the press and therefore not protected by the litigation privilege.[9]

We recognize that Stretch's Statement (summarizing a pleading on the day it was filed) is closer factually to the act in *Abraham* (delivering a proposed pleading to the press) than to the acts in *Susan A.* (non-party disclosing confidential information gained from an interview) and *GetFugu* (commenting about a separate legal proceeding). The salient question, however, is not how far the act is from delivering a pleading to the press, but whether the act meets the requirements for the litigation privilege, in light of the long-standing stricture that the litigation privilege will not protect statements that are made to persons who lack a substantial interest in the litigation. (*Susan A., supra*, 2 Cal.App.4th at p. 94; *GetFugu, supra*, 220 Cal.App.4th at p. 153; see *Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1299 (*Abuemeira*) ["the litigation privilege does not apply to publications to the general public through the press"]; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1141, 1149 (*Rothman*) [noting that "[s]tatements to nonparticipants in the action are generally not privileged under section 47, subdivision (b)," and holding

---

[9] In their anti-SLAPP motion, respondents did not provide a citation to the record to support their assertion that the Statement was sent to a targeted set of journalists. For this reason as well, respondents failed to assert *admissible* evidence that the Statement was emailed to persons with a substantial interest. At the anti-SLAPP hearing, respondents' counsel asserted that "as a publicly traded company, Facebook really had a responsibility to communicate with its stakeholders." But respondents present no authority that a statement issued to the press becomes privileged merely because company stakeholders—along with everyone else—might end up seeing it.

16

that the litigation privilege should not be extended to " 'litigating in the press' " because "it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes: poisoning of jury pools and bringing disrepute upon both the judiciary and the bar"].) To the extent *Abraham* holds the delivery of a pleading to the press is protected by the litigation privilege, we view it as a specific and limited exception to the general rule.

Indeed, the vitality of *Abraham* even as to the communication of an actual pleading is in doubt, as indicated by a decision issued decades ago. In *Shahvar, supra,* 25 Cal.App.4th 653, the court flat out disagreed with *Abraham* that the litigation privilege protected the communication of a pleading to a newspaper. In that case, Shahvar had his lawyer fax a copy of an unfiled civil complaint, which contained false allegations of defendants' wrongdoing, to a newspaper that published an article summarizing the allegations. (*Id*. at p. 656.) Shahvar filed the complaint with the court, and the defendants filed a cross-complaint for libel based on the delivery of the complaint to the newspaper. (*Id*. at pp. 657–658.) The court held that the communication of the complaint to the newspaper was not covered by the litigation privilege, because the newspaper was not related to the litigation. (*Id*. at p. 658.) Specifically, the court observed, "statements about existing or anticipated litigation by a party or the party's attorney to the news media, when the news media is neither a party to nor a participant in the litigation, are *not* privileged." (*Id*. at p. 659.) The court further explained that, to the extent *Abraham* had ruled the transmittal of a pleading to the press was covered by the litigation privilege, "*Abraham*'s conclusions are unsupported by case law, policy, or statute." (*Id*. at pp. 660–662.)

Not only does *Shahvar* cast doubt on *Abraham*, the California Legislature's response to *Shahvar* did nothing to support the idea that the delivery of a pleading to the press was subject to the litigation privilege. Senate Bill No. 1540 was introduced to "resolve [the conflict between *Shahvar* and *Abraham*] by clarifying the circumstances

17

under which persons who inform the press about what has taken place in an official proceeding are protected by an absolute privilege." (SB 1540, Assembly Committee on Judiciary, hearing of July 10, 1996, p. 4.)  Rather than addressing the issue under the litigation privilege of section 47, subdivision (b), the legislature opted to expand the fair and true reporting privilege of section 47, subdivision (d) so that it would cover not just a report *in* a public journal, but also a report of pleadings and other court documents *to* a public journal.  (*Ibid*.)  As a result, effective January 1, 1997, the fair and true reporting privilege pertains to "a fair and true report in, or a communication to, a public journal" of judicial and other proceedings.  (§ 47, subd. (d); see Stats. 1996, ch. 1055, § 2, p. 6641; *Rothman, supra*, 49 Cal.App.4th at pp. 1144–1145, fn. 3.)

We will examine *post* how the fair and true reporting privilege applies to Stretch's Statement; but for now we must conclude that the Statement was not subject to the litigation privilege because it was sent to the press, and consider next an additional reason the litigation privilege does not apply.

### 3. Necessary or Useful Step In the Litigation Process

For the litigation privilege to apply, there must be a sufficient nexus between the statement and the litigation.  Specifically, the statement must "achieve the objects of the litigation," which requires that it "be connected with, or have some logical relation to the action."  (*Silberg, supra,* 50 Cal.3d at pp. 212, 219–220.)  It therefore must "function as a *necessary or useful step in the litigation process* and . . . serve its purposes."  (*Rothman, supra,* 49 Cal.App.4th at p. 1146, italics added.)  "This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation."  (*Kashian, supra,* 98 Cal.App.4th at p. 920.)

In *Rothman,* an attorney was retained by a boy's father to seek redress against Michael Jackson for torts he allegedly committed against the boy; before any lawsuit was filed, the attorney began negotiating with Jackson.  (*Rothman, supra*, 49 Cal.App.4th at p. 1138.)  A psychological evaluation of the boy was leaked, containing "sensational"

18

charges. (*Id*. at p. 1138.) Jackson and others called a press conference, and later made additional statements to the media, in which Jackson not only denied the charges but also made countercharges that the lawyer and his clients had knowingly and intentionally made false accusations against Jackson in order to extort money from him. (*Id*. at p. 1139.) Rothman sued for defamation and other torts; the trial court sustained Jackson's demurrer to the complaint on the ground of the litigation privilege. (*Id*. at p. 1139.)

On appeal, the *Rothman* court held that the litigation privilege did not apply. After surveying the relevant law, the court concluded that, to be sufficiently in furtherance of the litigation, the communication must "function intrinsically, and apart from any consideration of the speaker's intent, to *advance a litigant's case*," noting examples such as the actual pleadings, a lis pendens, demand letters and communications directed towards settlement, communications between a law firm and persons with potential claims, and investigatory interviews. (*Rothman, supra*, 49 Cal.App.4th at p. 1148, italics added.) The statements made to the press to vindicate Jackson did not advance any litigation and, therefore, were not protected by the litigation privilege. (*Id*. at p. 1149.)

The facts in *Rothman* are different than the facts in this case, since in *Rothman* the statements were made to the press in connection with litigation that was merely threatened or anticipated, while Stretch's Statement was made to the press in connection with the lawsuit that had just been filed. But the essential point remains: the litigation privilege does not insulate statements that do not further the objects of the litigation.

Here, the evidence does not indicate that the Statement was a useful step in the process of the malicious prosecution action. Respondents argue it was useful in furthering the ultimate *goal* of the lawsuit, which was to set the public record straight regarding the Ceglia fraud and to hold accountable the lawyers who had "tried to extort Facebook through an abuse of the judicial system [that was] designed to call into public question the true ownership of Facebook." But that is nothing more than saying they wanted the world to know their view of the dispute—which does not further the litigation

19

*itself*. A desire to vindicate a client does not constitute the type of furtherance or connection sufficient for the litigation privilege to apply. (*Rothman, supra*, 49 Cal.App.4th at p. 1147 [noting that the fact the statements were "intended to vindicate Jackson" was insufficient: "While a person's motives for litigating a dispute may include a desire to be vindicated in the eyes of the world—a result which the litigation may achieve—this is not what is meant by the term 'objects of the litigation' "].)

In the final analysis, based on the record presented to the trial court in the anti-SLAPP proceedings, the litigation privilege of section 47, subdivision (b) does not preclude Argentieri from showing a probability of prevailing on his defamation claim.

B.  Fair and True Reporting Privilege: Civil Code Section 47(d)

Under section 47, subdivision (d), the fair and true reporting privilege protects a "fair and true report in, or a communication to, a public journal, of . . . a judicial . . . proceeding, or anything said in the course thereof." It too is an absolute privilege—that is, it applies regardless of the defendants' motive for making the report—and forecloses a plaintiff from showing a probability of prevailing on the merits. (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 98 *(J-M)*.)

Argentieri contends the trial court erred in its reliance on the fair and true reporting privilege because (1) respondents had not asserted the privilege in their motion to strike and Argentieri was thus deprived of due process, and (2) the record does not support the application of the privilege in this case. After a brief summary of the privilege, we turn to those arguments.

1.  Law

Unlike the litigation privilege, the fair and true reporting privilege pertains specifically to communications to the press, and it requires that the report be fair and true, not that it actually further the underlying litigation. (§ 47, subd. (d).)

To be " 'fair and true,' " the report must " '[capture] the substance, the "gist" or "sting", of the subject proceedings' " as measured by considering the " ' "natural and

20

probable effect [of the report]" ' " " ' "on the mind of the average reader." ' " (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1050, fn. 6.)  The defendant is entitled to a certain degree of "flexibility/literary license" in this regard, such that the privilege will apply even if there is a slight inaccuracy in details—one that does not lead the reader to be affected differently by the report than he or she would be by the actual truth.  (*J-M, supra,* 247 Cal.App.4th at pp. 99–100.)

### 2. Due Process

Argentieri argues that the trial court, by deciding the matter based on the fair reporting privilege, violated his due process rights to notice and an opportunity to be heard.  (Citing *Fuentes v. Shevin* (1972) 407 U.S. 67, 80; *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1069.)

As a threshold matter, Argentieri provides no legal authority for his proposition that the trial court, in assessing whether a plaintiff has a probability of prevailing on his claim, is prohibited from considering an applicable privilege supported by the evidence the parties presented, merely because the parties did not bring the privilege itself to the court's attention.  Indeed, the primary precedent on which respondents were basing their motion—*Abraham*—flagged the existence of the fair and true reporting privilege, since it observed that a statement in the press was protected by that very privilege; a glance at the current corresponding code section would have indicated the possible relevance of the reporting privilege to this case as well.  In our view, the potential application of section 47, subdivision (d) is rather obvious, since it explicitly pertains to reports in the press about judicial proceedings, which is precisely what Stretch's Statement was.

At any rate, while Argentieri contends the court's reliance on subdivision (d) of section 47 was prejudicial, he does not claim it was prejudicial because he would have presented any different or additional *evidence* if he had been aware the privilege was in play.  Instead, he contends he would have made the *legal arguments* he now makes in this appeal.  Specifically, he complains that respondents were not required to explain in the

21

trial court how the privilege applied and that Argentieri was not "given the opportunity" to "me[e]t any argument[s]" on this point. He maintains, for example, that if the issue had been raised by respondents, he would have argued that Stretch's categorical statement that the lawyers knew of the fraud was not a fair and true report of the equivocal allegations in the malicious prosecution complaint that the lawyers "knew or should have known" of the fraud and other allegations that had been made on "information and belief." Presumably, Argentieri would have raised in the trial court all of the other arguments he raises in his appellate briefs as well.

Accordingly, we need not decide this appeal based on the constitutional due process issue. If Argentieri's legal arguments are correct and the fair and true reporting privilege does *not* apply, we would reverse the judgment on that ground, whether or not Argentieri had a due process opportunity to make those arguments in the trial court. On the other hand, if Argentieri's legal arguments are incorrect and the reporting privilege *does* apply, not only was the trial court right to conclude the Statement is privileged under section 47, subdivision (d), Argentieri was not harmed by the absence of his legal arguments in the court below.

We therefore turn to the merits of Argentieri's arguments.[10]

### 3. Applicability of Section 47, Subdivision (d)

There is no dispute that Stretch's Statement was a report or communication to a "public journal" concerning the malicious prosecution action against Argentieri and

---

[10] Argentieri contends in his reply brief that, by not asserting the fair and true reporting privilege in the trial court, respondents waived it and the trial court should not have raised it for them. He informs us that a defendant's "failure to plead and prove a defense in the trial court precludes the defendant from raising the defense in the appellate court." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 907.) But his argument misses the mark. First, contentions raised for the first time in a reply brief will not be considered without a showing of good cause. (*REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500.) Second, at issue here is not whether an affirmative defense was waived by omitting it from an answer, but whether Argentieri met his burden under the anti-SLAPP statute to demonstrate a probability of prevailing on the merits.

22

others.  Moreover, in context, Stretch's Statement was a "fair and true" report of that proceeding.  It essentially asserted that respondents sought to hold accountable the named lawyers for Ceglia because they knew Ceglia's case was based on the forged Work for Hire Contract.  And that was the gist of their malicious prosecution action as well.  Argentieri's arguments to the contrary are unavailing.

### a. Statement was Different Than The Complaint's Allegations

Argentieri argues that Stretch's Statement is not a fair and true report of the malicious prosecution action because the Statement claims Argentieri and others *knew* the case was based on forged documents, while the malicious prosecution complaint alleged that the lawyers *knew or should have known* that the lawsuit was a fraud.  Argentieri also points out that many of the allegations in the malicious prosecution complaint were made on information and belief.  Basically, Argentieri maintains that the Statement more definitively asserted his knowledge of Ceglia's purported fraud than did the allegations the Statement purported to report.

We find Argentieri's argument unpersuasive.  There is, of course, a legal distinction between one who knew about a forgery and one who knew or should have known about it, and there is also a difference between asserting something as a fact and alleging it on information and belief.  But in determining the applicability of the fair and true reporting privilege, "[t]he report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer." (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 398 (*Burrill*), disapproved on another ground in *Baral v. Schnitt, supra*, 1 Cal.5th at p. 396, fn. 11.)  It is sufficient if the statement conveys the "gist" of the action, as measured by "how those in the community where the matter was published would reasonably understand it." (*Ibid*.)  Here, both the malicious prosecution action and Stretch's Statement asserted that Ceglia's lawyers *knew* the Work for Hire Contract was forged; the fact that the malicious prosecution action *also* left open the possibility that the lawyers merely should have known of the fraud, or made

23

some of the allegations on information and belief, does not make Stretch's Statement so great a distortion as to render it unfair or untrue for purposes of section 47, subdivision (d). (See, e.g., *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351 [the " 'fair and true' requirement 'does not limit the privilege to statements that contain no errors,' " and a statement about ongoing litigation "need not track verbatim the underlying proceeding," because "[o]nly if the deviation is of such a "substantial character" that it "produces a different effect" on the reader will the privilege be suspended"]; *Microsoft Corp. v. Yokohama Telecom Corp.* (C.D. Cal. 1998) 993 F.Supp. 782, 784 [corporation's "paid announcement" in a national media publication was a fair and true reporting of a civil lawsuit because it generally "capture[d] the substance of . . . the proceedings"].)

### b. Dismissal of Argentieri's Co-Defendants

Argentieri next emphasizes the decision of the New York Appellate Division, which dismissed the malicious prosecution claim against other attorneys who had represented Ceglia. That decision, however, has no bearing on whether the Stretch Statement was a fair and true report of the malicious prosecution action.

In the first place, the Stretch Statement reported the allegations of the malicious prosecution *complaint*; the fact that the court later found those allegations insufficient to state a claim against some of Ceglia's lawyers does not mean that Stretch's Statement did not accurately report what the allegations were.

Furthermore, while the New York Appellate Division concluded that the pleading did not state a claim for malicious prosecution or deceit against Ceglia's *other* lawyers, it did not decide whether the allegations were sufficient to hold *Argentieri* liable. The New York court made no findings regarding Argentieri's knowledge of Ceglia's fraud. In fact, the court reached its conclusions in part due to the efforts taken by the other attorneys to investigate the authenticity of the Work for Hire Contract and Ceglia's claims, and there is no allegation that Argentieri undertook the same or similar investigation. We also note, as did the New York court, that the other attorneys were notified by Kasowitz of its

24

suspicions *after* Ceglia's amended complaint had been filed, while Argentieri was repeatedly advised of Kasowitz's concerns *before* it was filed. The New York court's findings and order as to Ceglia's other attorneys do not evince any unfairness or untruthfulness in Stretch's report of the allegations as to Argentieri.

### c. Court or Jury Question

Argentieri further contends it was for a jury, not the trial court, to decide whether Stretch's Statement was a fair and true report. Courts have stated that the fairness and truth of a report is an issue of fact for the jury, *if* there is any material factual dispute on the issue. (See *Burrill, supra*, 217 Cal.App.4th at p. 399 [whether report is fair and true is for the jury to determine if there is a question of fact as to whether the average listener would understand the communication captured the gist of the complaint]; *J-M, supra,* 247 Cal.App.4th at pp. 98–99 [whether report is "fair and true" is a question of fact and, provided reasonable minds could disagree on that point, a question for the jury].)

Here, in our de novo review, we find no genuine issue of material fact as to the content of Stretch's email to the press, the content of the malicious prosecution action, or whether an average reader would understand Stretch's Statement to be a fair and true report of the gist of the malicious prosecution action. Argentieri fails to show error.

### d. Burrill *and the Second Restatement of Torts*

Argentieri additionally points us to *Burrill, supra,* 217 Cal.App.4th 357. There, a counselor had concluded in child custody proceedings that one of the parents was emotionally and psychologically abusing the child and presented a threat. The parent lost custody of the child, and then allegedly made statements online and over the radio that accused the counselor of crimes, child abuse, financial extortion, and practicing psychology and prescribing drugs without a license. (*Id*. at pp. 364–365.) The counselor filed a lawsuit against the parent for defamation. The parent filed an anti-SLAPP motion to strike the complaint, which the trial court denied. (*Id*. at pp. 376–377.) The court of appeal affirmed, finding that the counselor had demonstrated a probability of prevailing

25

on the defamation claim, in part because the parent's statements on the radio were not subject to the fair and true reporting privilege. (*Id*. at p. 396.)

In reaching this decision, the court in *Burrill* concluded that the radio interview, in which the parent purported to recount a citizen complaint the parent had lodged, was not a report of a "judicial" or "other public official proceeding" within the meaning of section 47, subdivision (d). Basing its conclusion on the Restatement Second of Torts, the court stated, "[A]s the Restatement Second of Torts, section 611, comment e, page 300 explains: 'A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in [Section 611]. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action. (See Comment c).' " (*Burrill, supra*, 217 Cal.App.4th at 397.) As *Burrill* set forth in a footnote, "Comment c to this section provides in relevant part: 'A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not.' [Citation.]" (*Burrill, supra*, 217 Cal.App.4th at p. 397, fn. 6.) Because no action had been taken with respect to the parent's citizen complaint, the parent's radio interview was not a report of a judicial or official proceeding. (*Id*. at p. 397.)[11]

Based on *Burrill*, Argentieri suggests that the fair and true reporting privilege does not apply to a report of a mere pleading in a lawsuit by the party who filed the lawsuit,

---

[11] The Restatement Second of Torts, section 611, provides: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." (Rest. (Second) of Torts § 611, at p. 297 (1977).)

26

and therefore it should not apply to Stretch's Statement about the malicious prosecution action brought by Facebook and Zuckerberg. He speculates that, given the likelihood the malicious prosecution action was going to be dismissed at its inception, respondents were motivated to file the lawsuit and immediately publicize it through the press in order to fill the public's mind with respondents' version of the facts and their implicit threat that any lawyer who dares to sue Facebook or Zuckerberg will risk getting sued.

*Burrill* is distinguishable from the matter at hand. First, *Burrill* concerned a citizen complaint that the defendant had merely lodged with law enforcement, and which law enforcement had not acted upon. (*Burrill, supra*, 217 Cal.App.4th at 396.) Here, by contrast, the pleading Stretch summarized had been filed with the court to commence an official judicial proceeding. (See *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 432 (*Healthsmart Pacific*) ["judicial proceeding," within the meaning of § 47, subd. (d), includes the filing of a complaint].) Second, *Burrill* concerned a report made by the complainant. Here, by contrast, the Statement was made by Stretch, the attorney for Facebook and Zuckerberg. And while Argentieri alleges that Stretch was acting on the other respondents' behalf, an attorney's summary of a pleading he filed to commence a judicial proceeding is materially different than an individual's discussion of a citizen complaint she herself had lodged with law enforcement. (*Ibid.*)

Furthermore, while the comments to section 611 of the Restatement Second of Torts may have supported the conclusion in *Burrill* based on the facts presented in *that* case, they have no authority in this case. The fair and true reporting privilege in California is a creation of statute—namely section 47, subdivision (d)— and in interpreting that statute we are not bridled by the Second Restatement of Torts, which summarizes general principles of common law. On its face, section 47, subdivision (d) pertains to reports of a "judicial proceeding"—which has long been held to include the filing of a complaint—not to reports of a "judicial proceeding except for pleadings that are filed in a judicial proceeding." Moreover, as discussed *ante*, the legislative history of

27

section 47, subdivision (d) makes it clear that our legislature fully intended to protect as privileged an attorney's communication of a complaint to a newspaper on behalf of his client (as occurred in *Shahvar*). And while Stretch made a statement summarizing the complaint rather than delivering the complaint itself, it would be anomalous to hold privileged the delivery to the press of the complaint—with its extended and more detailed allegations of Argentieri's purported wrongdoing—but not the delivery to the press of a mere summary that succinctly sets forth its gist. (See *Healthsmart Pacific, supra*, 7 Cal.App.5th at pp. 432–434.)

### e. Rules of Professional Conduct

Section 47, subdivision (d)(2)(A) provides that a communication to a public journal is not subject to the privilege if it "[v]iolates Rule 5-120 of the State Bar Rules of Professional Conduct." In turn, rule 5-120(A) states: "A member who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication *if the member knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in* the matter." (Italics added.)

Argentieri asserts that rule 5-120 applies to in-house counsel such as Stretch. (See Cal. Rules of Court, rule 9.46 (c)(6).) He further contends Stretch knew or should have known that the Statement had a substantial likelihood of materially prejudicing the malicious prosecution case, because of the inherent dangers and improprieties of litigating in the press. (See, e.g., *Susan A., supra,* 2 Cal.App.4th at pp. 95–96 [" '[t]rial by press' " is " 'forbidden to counsel and subversive of the fair and orderly conduct of judicial proceedings' "]; *Abuemeira, supra,* 246 Cal.App.4th at p. 1299 [litigating in the press "serves no purpose other than to provide immunity to those who would inflict damage upon the judiciary"]; *Rothman, supra,* 49 Cal.App.4th at p. 1149 [litigating in the press leads to poisoning of jury pools and disrepute upon the judiciary and the bar].) In

28

addition, Argentieri points us to respondents' assertion in their briefing that the Statement was issued to "set[] the public record straight," from which he concludes that respondents emailed the Statement to the media to get the public to prejudge their malicious prosecution case favorably.

Argentieri's argument is meritless. In the first place, he ignores the rest of rule 5-120. Subdivision (B) of rule 5-120 states: "Notwithstanding paragraph (A), a member *may* state: [¶] (1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved; [¶] (2) the information contained in a public record; . . . ." (Italics added.) Here, Stretch's Statement described the claim in the malicious prosecution action and the gist of the allegations of the publicly-filed complaint.

Furthermore, Argentieri does not demonstrate how the evidence submitted to the trial court shows that Stretch knew or should have known the Statement had a *substantial* likelihood of *materially* prejudicing the malicious prosecution proceeding. The Statement was issued when the complaint was filed, long before any jury pool was formed; and it did not set forth any secret information or evidence that Argentieri claims to be inadmissible, but merely provided an ostensibly fair and true summary of the filed complaint. (See comment to rule 5-120.)

In sum, Stretch's Statement is protected by the fair and true reporting privilege of section 47, subdivision (d). Accordingly, Argentieri failed to establish a probability of prevailing on his defamation claim, and the trial court did not err in granting respondents' anti-SLAPP motion to strike his complaint.[12]

---

[12] As mentioned, respondents urge that Argentieri also has no probability of prevailing on his defamation claim because Stretch's Statement was a non-actionable opinion and because Stretch's assertion—that Argentieri knew Ceglia's lawsuit was based on forged documents—was true. Because Argentieri has no probability of prevailing due to the fair and true reporting privilege, we need not and do not consider these additional issues.

## III.  DISPOSITION

The order is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

(A147932)

30

Superior Court of San Francisco County, No. CGC-15-548503, Joseph M. Quinn, Judge.

Alioto Law Firm, Joseph M. Alioto; Law Offices of Jeffrey Perkins, Jeffrey Perkins; Messina Law Firm Gil D. Messina for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Orin S. Snyder, Robert Gonzalez and Adam Yarian for Defendants and Respondents.