Filed 6/22/26  Palmieri v. Foondos CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| PAMELA J. PALMIERI et al.,<br>        Plaintiffs and Appellants,<br><br>v.<br><br>STEPHEN FOONDOS et al.,<br>        Defendants and Respondents. | C100383<br><br>(Super. Ct. No. 34-2018-00233339-CU-NP-GDS) |

SUMMARY OF THE APPEAL

California Rule of Professional Conduct, Rule 1.5.1, "Fee Divisions Among Lawyers" provides in subdivision (a):

"Lawyers who are not in the same law firm shall not divide a fee for legal services unless:

"(1) the lawyers enter into a written agreement to divide the fee;

"(2) the client has consented in writing, either at the time the lawyers enter into the agreement to divide the fee or as soon thereafter as reasonably practicable, after a full written disclosure to the client of: (i) the fact that a division of fees will be made; (ii) the identity of the lawyers or law firms that are parties to the division; and (iii) the terms of the division; and

1

"(3) the total fee charged by all lawyers is not increased solely by reason of the agreement to divide fees." (Asterisks removed.)

This appeal provides a casebook example of the reason for the rule.

The matter arises from a dispute between plaintiff Pamela Palmieri and defendants Stephen Foondos, John Sargetis, and the United Law Center (ULC) regarding Palmieri's entitlement to collect attorney fees after a settlement was entered between Kayrinkia J. Gilliland and various defendants in a foreclosure action. Gilliland had initially retained Palmieri under a contingency fee agreement, and defendants had entered their own agreement with Gilliland when they hired Palmieri as an associate at ULC. Before the case settled, Palmieri parted ways with ULC, but she continued to advise Gilliland in the foreclosure action while ULC also remained on as counsel. The parties never reached an agreement regarding the proper division of fees in the case. Instead, Palmieri sought to collect a share of the attorney fees awarded by (1) aggressively asserting she had a right to collect a large share of the attorney fees based on a contractual lien established in her contingency agreement with Gilliland; and (2) filing the instant action on behalf of herself and Gilliland in which she alleged (among other causes of action) that defendants had breached their fiduciary duties to her and the client by failing to retain in their trust account the amount of funds from the settlement that she sought under her lien.

The trial court entered judgment in favor of defendants. We affirm the judgment.

## FACTS AND HISTORY PROCEEDINGS

Facts

Because no party argues the trial court's factual findings were incorrect, we accept those findings and adopt them here. (See *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 [Stating we review factual findings under the substantial evidence test, we assume those finding are correct, and it is an appellant's burden to show the findings of fact are not correct].)

"Client Gilliland entered into a contingency fee agreement with attorney Palmieri on May 13, 2013. Palmieri's legal representation was for a wrongful foreclosure lawsuit filed by Gilliland in state court in 2014 against Chase Bank and others [(the Chase action)], but removed by the Chase defendants to federal court. The fee agreement granted Palmieri a lien on Gilliland's causes of action, for any unpaid costs or attorney fees.

"In 2015, both Gilliland and Palmieri initiated relationships with ULC, a professional corporation of attorneys Foondos and Sargetis.

"At that time, Palmieri was in negotiations with ULC to be hired as an associate attorney. In addition to a salary, the parties discussed splitting any contingency fees from certain clients that Palmieri was bringing to ULC, including Gilliland. Foondos indicated that ULC's typical referral fee was 20 percent, but could be higher if the referring attorney had done substantial work on the case. Foondos indicated in a meeting with Gilliland and Palmieri that the latter 'would be taken care of.'

"Gilliland signed a contingency fee agreement with ULC for representation in the [Chase action] and ULC was substituted as attorney of record for Gilliland in the [Chase] action.

"In the process of hiring Palmieri, Foondos asked her for payroll paperwork, a list of her clients, new fee agreements with new clients, and a fee-splitting agreement between ULC and Palmieri. Thereafter, he continued to encourage Palmieri [to] finalize the latter agreement.

"In August of 2015, Palmieri was hired by ULC and began working as an associate. Ten months later, she was terminated for poor performance. . . . .

"The evidence showed that ULC was still willing to enter into a fee-splitting agreement with Palmieri, offering 20 percent when she was leaving the firm in June of 2016. However, Palmieri demand[ed] a one-third share, which ULC indicated was too

3

high. Again in December 2016, ULC indicated a willingness to provide Palmieri a share of any attorney fees.

"No fee-splitting agreement was ever agreed upon or documented.

"[Other Matter]

"In March 2017, Palmieri learned that . . . another client that she had transitioned to ULC in 2015[] was settling her lawsuit. She contacted ULC, indicat[ed] that 20 percent of the attorney fees [to Palmieri in that matter] would have been appropriate if she had not been 'downsized,' but now she wanted a full half of the contingency fee to be received by ULC. She objected to ULC increasing [the client]'s share of the settlement and reducing the amount allocated to attorney fees below $80,000 without her permission.

"Palmieri contacted opposing counsel and demanded that the settlement check be made payable to both her and ULC. Opposing counsel declined, since only ULC was counsel of record and, in any event, a certain term of the settlement was still being negotiated. Palmieri indicated she would file an association of counsel in the [other] matter and also threatened to file a lien, indicating to opposing counsel that his firm could be held liable if she did not also get paid. In communications with ULC, she objected to the release of any funds to ULC until that firm agreed to a fee split with her.

"Palmieri had also contacted [the other client] and procured a letter from [that client] to ULC indicating that Palmieri should now be involved in reviewing the settlement agreement and that Palmieri should receive more than half (60 percent) of the attorney fees. She also sent a multi-page letter to opposing counsel in the [other] matter claiming she had a lien and threatening that firm with liability if it continued to decline to place her name on the settlement check. Palmieri also drafted a complaint letter to the State Bar regarding ULC and Foondos'[s] actions during the [other] settlement.

"[The other client] received her settlement two months later, in May 2017. Palmieri complained that ULC's unilateral decision to distribute a certain amount to [the

4

client] had affected her asserted portion of the attorney fees. She continued negotiations with Sargetis and eventually ULC agreed to pay Palmieri a portion of the . . . contingency fee [collected in that matter].

"Gilliland Matter

"ULC's agreement to pay [Palmieri] a share of the . . . fees [in the other matter] encouraged Palmieri to repeat her coercive tactics in the [Chase action] underlying this case.

"The [Chase] action was settled in 2018 following a mediation with Chase Bank. In April 2018, Palmieri contacted Sargetis and requested fifty percent of the contingency fee on that recovery. Sargetis indicated that was not acceptable, as most of the work on her case had been done by other attorneys at ULC and most of Palmieri's work had been done while she was being compensated by ULC as an associate. [Fn. omitted.] Palmieri responded that she would not negotiate downwards from fifty percent and if ULC did not agree by the time the settlement funds arrived, she would seek recovery on a proportional basis and expected seventy percent.

"Sargetis and Palmieri then negotiated back-and-forth over April and early May 2018 to attempt to resolve their disputed. [*Sic.*] Ultimately, Sargetis indicated that they were at an impasse and suggested mediation, with some of the attorney fees remaining in trust pending resolution. Palmieri would not accept a binding decision from a mediator and indicated she'd need time to select a mediator. [Fn. omitted.] She also asked that Gilliland's share of the settlement be sent to her as soon as possible, as Gilliland was trying to close on a new house. Sargetis arranged to have the funds electronically sent to Gilliland.

"Later in May, Sargetis informed Palmieri that ULC had reviewed the file and determined that Palmieri had withdrawn as counsel, been compensated as a ULC employee, and that the parties had never agreed orally or in writing to share fees.

5

Sargetis informed her that ULC would not be sharing any fees under its exclusive fee agreement with Gilliland.

"Palmieri was outraged, claimed to have done most of the work for Gilliland, that Sargetis was being dishonest and not acting in Gilliland's interest, and that she had supplied legal authority for her position in connection with the [other client's] matter. She then threatened to report Sargetis to the State Bar during the discussion about the validity of Palmieri's claim. [Fn. omitted.]

"Palmieri immediately contacted Gilliland and had her write a note indicating that she was disputing the fee and that defendants were not authorized to distribute any fees. Palmieri then texted a photo of that note to defendants. Prior to this happening, Sargetis had discussed the proposed distribution of the settlement amount with Gilliland. Defendants had reduced the share of the fees payable to them, in order to increase the amount of the settlement that went to Gilliland and had already wired that increased amount to Gilliland because of her urgent need for the funds. Sargetis responded to Gilliland asking for clarification and informing her that Palmieri was attempting to insert her into a dispute among her attorneys over their respective fees.

"Gilliland was a family friend of Palmieri. Gilliland remembers Foondos discussing giving 20 percent of her fees to Palmieri and their initial meeting, but gave confused testimony on any agreement at the time of the mediation and settlement of her case. Palmieri obviously counse[l]ed Gilliland on what to say at trial, just as Palmieri had written and procured the note at the time of the distribution of the settlement. Gilliland was elderly and in poor health and, at the time of the settlement, in desperate need of funds. Palmieri exploited Gilliland's condition and their friendship to attempt to use her as a tool in Palmieri's attempt to collection [*sic.*] some of the fees. Had defendants not already distributed Gilliland's share of the settlement to her and had Gilliland not removed herself form [*sic.*] the dispute over attorney fees after being contacted by Sargetis, Palmieri's tactics could have significantly delayed Gilliland's

6

receipt of any funds. Had Palmieri threatened opposing counsel, like in the [other] matter, her actions could have delayed or derailed the settlement itself.

"Palmieri has not sought quantum meruit recovery from Gilliland and stated on the record that she will not do so. Since there was not and will not be any such claim here, Gilliland has suffered no damages or harm and therefore cannot recover for breach of fiduciary duty. To the extent Gilliland was ever exposed to the threat of harm, it was due to Palmieri's tactical refusal to finalize a fee-splitting agreement that would have clarified her compensation for work on Gilliland's case. Defendants, on the other hand, repeatedly and affirmatively offered to do so. The only attorney who potentially would have had a quantum merit claim against Gilliland was Palmieri and she failed to inform Gilliland that her refusal to enter into a fee-splitting agreement exposed Gilliland to that liability. The court therefore finds that defendants did not breach their fiduciary duty to Gilliland. If anybody did, it was Palmieri.

"Based on Palmieri's actions towards both Gilliland and defendants, the court finds that defendants acted in good faith in offering to address Palmieri's lien and Palmieri did not. Instead she tactically declined to finalize a fee sharing agreement, document it, and obtain Gilliland's consent, so that she could later attempt to obtain a fee share much larger than she would have accepted earlier. . . . .

"Based on the same grounds, the court finds that defendants did not act with any fraudulent intent towards plaintiff. They repeatedly attempted in good faith to share fees and declined to do so only when they had a good faith belief that Palmieri had no entitlement to recover any fees. . . . . ."

<u>Initial Complaint through Demurrer on the Operative Complaint</u>

Plaintiffs filed this action on May 21, 2018.

In May 2019, after the defendants filed a demurrer to the original complaint, the plaintiff's filed a first amended complaint. The first amended complaint alleged causes

7

of action for declaratory relief, breach of fiduciary duty, conversion, breach of contract, imposition of constructive trust, and negligence. Defendants filed a demurrer to the first amended complaint too.

The trial court sustained the demurrer to the first amended complaint with leave to amend.

On October 10, 2019, plaintiffs filed a second amended complaint (the complaint), which is the operative complaint here. In the complaint, Palmieri alleged causes of action against the defendants for breach of fiduciary duty, conversion, breach of contract, breach of contract related to a referral fee, misrepresentation, and imposition of constructive trust. Gilliland joined the causes of action for breach of fiduciary duty, misrepresentation, and imposition of constructive trust. Plaintiffs alleged Palmieri had filed an action against Gilliland for declaratory relief to establish the validity, existence, and value of Palmieri's lien on Gilliland's causes of action in the Chase action.

Defendants demurred to the complaint. The trial court sustained the demurrer on Palmieri's two breach of contract causes of action without leave to amend. It also sustained the demurrer on Gilliland's imposition of constructive trust cause of action. It overruled the demurrer on the remaining causes of action and ordered the defendants to answer. The plaintiffs do not challenge the trial court's ruling on the demurrer here.

Defendants filed a general denial to the complaint. With their denial, they asserted various affirmative defenses, including an equitable defense of laches, unclean hands, failure to do equity, and waiver.

Palmieri v. Gilliland

Palmieri filed a declaratory relief action against Gilliland in October 2019 (Sacramento Superior Court Case No. 34-2019-00266929.) The defendants intervened in the action. The trial court entered a judgment granting declaratory relief in that action in June 2022. The trial court ordered, adjudged, and decreed that, as between Palmieri and

8

Gilliland, "the Court determines and declares the contractual attorney's lien between Palmieri and Gilliland, as set forth in the 'Attorney Client Fee Agreement' between them signed on or about May 13, 2013, to be valid," and that the value of the lien was $80,000. The judgment notes that during the trial, "consistent with her contention the [defendants] should not be heard in" the declaratory relief proceeding, "on their challenges to the validity and value of any lien . . . Palmieri stipulated that any ruling in," the declaratory relief proceeding, "would be between [Palmieri] and [Gilliland] only, and would not have preclusive (e.g., collateral estoppel) effect as to the [defendants]." In a footnote, the trial court added, "[a]s between . . . Palmieri and . . . Gilliland, in a post-trial e-mail to the Court, Palmieri indicated she has no desire or intention to seek to recover costs from Gilliland. As between Palmieri and [defendants], the Court finds there is no prevailing party."

Motion for Summary Judgment, Trial, Decision, Judgment, and Appeal

The defendants filed a motion for summary judgment or adjudication against Gilliland in this action. The trial court granted summary adjudication on her cause of action for misrepresentation. More details regarding this ruling will be provided below as relevant.

In July 2023, the trial court held a bench trial on the remaining causes of action. The court had bifurcated the issue of liability from the question of damages. "Since Palmieri lost on the first issue, [the trial] court never fully received evidence on the respective efforts of Palmieri (while she was not at ULC) and ULC on the Gilliland case prior to the settlement."

Following trial, the trial court issued a statement of decision in which it stated it would enter judgment on previously adjudicated causes of action based on those adjudications. The court also decided it would enter judgment in favor of defendants on both plaintiffs' breach of fiduciary duty causes of action, Palmieri's conversion cause of

9

action, Palmieri's misrepresentation cause of action, and Palmieri's cause of action seeking the imposition of a constructive trust.

In addressing Palmieri's fiduciary duty cause of action, the court observed that Palmieri's argument was that "successor counsel in the possession of settlement or other proceeds against which a predecessor attorney has a lien has a fiduciary obligation to the attorney lienholder with respect to the funds."  Citing *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 594-601 (*Weiss*), the trial court explained that case law might support finding a duty where (1) a client agrees to a contractual lien with an attorney, discharges that attorney, then settles their case using a second attorney; and (2) neither the client nor subsequent attorney would acknowledge the lien.

However, the trial court concluded the instant case did not come within the cited case law, because this was not a case where the second attorney or client would not acknowledge or cooperate in compensating the first attorney.  Instead, the trial court reasoned, this was a case where the two attorneys could—and should—have resolved a possible dispute over how to divide the fees for their services using the mechanism described in Rule 1.5.1(a) of the Rules of Professional Conduct (Rule 1.5.1(a)).

As earlier set forth, under Rule 1.5.1(a), "[l]awyers who are not in the same law firm shall not divide a fee for legal services unless:  [¶]  (1) the lawyers enter into a written agreement to divide the fee;  [¶]  (2) the client has consented in writing, either at the time the lawyers enter into the agreement to divide the fee or as soon thereafter as reasonably practicable, after a full written disclosure to the client of: (i) the fact that a division of fees will be made; (ii) the identity of the lawyers or law firms that are parties to the division; and (iii) the terms of the division; and  [¶]  (3) the total fee charged by all lawyers is not increased solely by reason of the agreement to divide fees."  (Asterisks removed.)

10

The trial court noted the purpose of the rule is client and public protection, and to promote respect for and confidence in the legal profession. (Citing *Chambers v. Kay* (2002) 29 Cal.4th 142, 155-162 (*Chambers*).)

The trial court said, "[i]f, as in this case," the liability of a client to their first counsel, "can be addressed in a fee-sharing agreement with successor counsel, the attorney can and should do so, since then their client will then have certainty regarding their obligation to the discharged attorney. [¶] Palmieri simply ignored Rule 1.5.1(a) and instead attempted to use inapposite law on fiduciary duties regarding a lien on a client's recovery to extort a larger share of attorney fees."

The trial court found that Palmieri's conversion and constructive trust causes of action were derivative of her other causes of action.

The trial court found for defendants on Gilliland's breach of fiduciary duty cause of action on the grounds that because Palmieri had stated she would not seek recovery from Gilliland, Gilliland could not show damages on her cause of action.

The trial court entered a judgment after court trial in defendants' favor and awarded costs for defendants against Palmieri only. The plaintiffs appealed.

DISCUSSION

*I*

*General Principals of Appellate Review*

" 'As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116 [].)" (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 126.)

11

Every brief must, "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)

"Appropriate headings require litigants to ' "present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass." [Citation.]' [Citation.]" (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) Thus, " '[f]ailure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading.' (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 [].)" (*Johnson v. Department of Transportation* (2025) 109 Cal.App.5th 917, 948; see also *Dameron Hospital Assn. v. Progressive Casualty Ins. Co.* (2025) 111 Cal.App.5th 530, 541.)

With respect to the need for arguments supported with citations to authority, when a brief does not furnish a "legal argument *with citation of authorities on the points made*," we may treat the argument raised as waived and pass on it without consideration. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793, italics added.) It is not our role to construct an appellant's arguments for them. (*Ibid.*)

"Generally speaking, the scope of the issues on appeal is determined by the appellant's opening brief; that is, the issues presented through reasoned argument in an appellant's opening brief are normally the only bases upon which [the court] will reverse the judgment or order challenged on appeal." (*People v. Hannon* (2016) 5 Cal.App.5th 94, 104.) Relatedly, " ' "arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." ' [Citation.] Accordingly, courts will not consider such an argument 'absent a showing why the argument could not have been made earlier.' " (*Starr v. Mayhew* (2022) 83 Cal.App.5th 842, 854 (*Starr*).)

Based on these principles, we have defined the scope of the issues in this appeal as those identified in the headers of the argument sections of the opening briefs. Additionally, in fairness to the defendants and in consideration of the burdens deficient briefing places on the court, we treat arguments made that lack appropriate legal citations and/or development in the opening briefs as forfeited.

Finally, we note that, "[t]here is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion." (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568.)

## II

### *Judgment Against Palmieri*

Based on the headers used in her opening brief, Palmieri appears to be focusing on her fiduciary duty cause of action in her argument that the trial court erred in entering judgment against her.

Palmieri begins the discussion section of her opening brief by claiming that as Gillilan's "predecessor attorney" in the Chase action, she was entitled to recover her lien for the quantum value of her services for 2013 through 2015 "against the fee recovered and held by successor attorney United Law Center." To support this claim, Gilliland cites *Fracasse v. Brent* (1972) 6 Cal.3d 784 (*Fracasse*) and *Weiss*, *supra*, 51 Cal.App.3d at page 598. Later, she argues that "United Law Center received settlement funds against which Palmieri had a lien. Receiving the funds subject to Palmieri's lien imposed on United Law Center a fiduciary duty to Palmieri." Finally, in an argument citing *Aresh v. Marin-Morales* (2023) 92 Cal.App.5th 296 (*Aresh*), she claims that her lien had priority over any claim ULC might have to attorney fees, and that because her lien had "priority"

13

the trial court erred in not finding it should be taken from the contingency fee payment held by ULC.

Conspicuously absent from the opening brief is any argument by Palmieri regarding the trial court's application of Rule 1.5.1, and, equally important, the policy reasons that underly the rule as articulated in *Chambers*, *supra*, 29 Cal.4th at pages 155 through 158. Instead, Palmieri has reserved her argument regarding Rule 1.5.1 for her reply, where she argues Rule 1.5.1 does not apply because this action is "*not* a dispute over a fee-splitting agreement" and ignores the policy discussion in *Chambers*.

Palmieri's arguments fail to persuade us that the trial court's entry of judgment in defendants' favor was in error. Notably, nowhere in her argument does Palmieri identify with a proper header an argument that there is a theory of conversion that is not "derivative" of her fiduciary duty claim under which she says she should have prevailed on at trial.

First, the cases Palmieri cites to support her claims that (1) she was entitled to recover her lien; and (2) when ULC received settlement proceeds it received them subject to a fiduciary duty to her are inapposite under the facts of this case. To the extent *Fracasse* addressed a discharged attorney's right to collect fees under a quantum meruit theory, *Fracasse* concerned an action brought by a discharged attorney against a client. (*Fracasse*, *supra*, 6 Cal.3d at p. 786.) The central issues in *Fracasse* were whether the discharged attorney's fees should be based on the contingency rate stated in the retainer agreement with the client, and when an action to collect the fees might be timely. (*Id.* at pp. 786-787, 791-792.) *Fracasse* does not concern the duty of *successor counsel* to protect fees owed to prior counsel.

In *Weiss*, the court allowed a discharged prior counsel to proceed against a successor counsel in actions for money had and received, conversion, constructive trust, and interference with contractual relationship. (*Weiss*, *supra*, 51 Cal.App.3d at pp. 595-597, 601.) In *Weiss*, the discharged attorney had alleged that after subsequent counsel

14

collected a full settlement payment in an action, all the settlement funds were distributed to the former client and his subsequent counsel, and none of the funds had been used to pay the discharged attorney's reasonable fees. (*Id.* at p. 595.) There is no discussion in *Weiss* or *Fracasse* regarding obligations to a client's first counsel and the proper means to measure the value of the first counsel's services when (1) the second counsel and the client both express a desire to negotiate a payment to the original counsel; and (2) "prior counsel" continues to engage with the client up until the point the case settles.

Similarly, the California court decisions Palmieri cites for the proposition that ULC was under a fiduciary duty to hold funds in trust to pay her lien against Gilliland do not persuade us that a fiduciary duty was violated under the facts of this case.

In *Johnstone v. State Bar* (1966) 64 Cal.2d 153, 155, the third-party lien holder to whom the lawyer owed a fiduciary duty had supplied workmen's compensation benefits to an injured party, and the disciplined attorney failed to retain sufficient funds from the entire settlement to satisfy the lien. In *Guzzetta v. State Bar* (1987) 43 Cal.3d 962, 972, 979, our Supreme Court acknowledged that an attorney who held proceeds from the sale of a restaurant in his trust account which were payable to his client and his client's ex-wife had a duty to account for the funds when they were deposited into his trust account. In *Baca v. State Bar* (1990) 52 Cal.3d 294, 298, Baca represented a client on a workers' compensation matter. The client had previously been represented by three other law firms. (*Ibid.*) As part of an approved compromise, the Workers' Compensation Appeals Board ordered an insurance company to pay attorney fees and specified the exact amount each of the client's prior counsel was to receive. (*Ibid.*) When the insurer sent the entire attorney fee award to Baca, he deposited the amount into his general account. (*Ibid.*) The insurer later realized its mistake, and Baca said he would rectify the matter, but he never did. (*Id.* at pp. 298-299.) In explaining the State Bar's conclusion that Baca's actions with respect to the attorney fees had violated a rule of professional conduct that requires an attorney to promptly pay a client money owed to them, the Court wrote,

15

"[a]lthough the money was to be paid to the three law firms, it was to come from a settlement of [the client's] claim. The law firms were entitled to the money because of the attorney lien claims. 'Attorneys fees payable to the legal counsel for the injured worker are a lien on the injured's award; thus, they come out of the injured's recovery.' " (*Id.* at p. 299, fn. 3.) *Baca* never frames the issue as one involving a fiduciary duty. *Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 692, 698, 701-702 acknowledged the duties an attorney representing a stock purchaser owed to the seller when the attorney agrees to act as an escrow holder of stock shares for the transaction.

In short, none of these cases stand for the proposition that an attorney violates a fiduciary duty to cocounsel when—based upon the "good faith" belief that they were not required to split attorney fees with cocounsel—the attorney collects settlement funds, distributes an amount of the settlement to the client upon the request of cocounsel, then deposits the remaining funds into their general fund.

Here, to the extent Palmieri's lien was determined to be valid and worth $80,000, the lien was found to be between "Palmieri and Gilliland." The ruling was between Palmieri and Gilliland "only." While the lien may have given Palmieri a right to try to collect from Gilliland, it did not give her a right to collect the value of her services from defendants' fee award. (Cf. *Olsen v. Harbison* (2010) 191 Cal.App.4th 325, 332 (*Olsen*) [rejecting a quantum meruit claim raised by a first counsel against a second counsel in an action when the client had consented to a fee division then fired her first counsel because the "client had a direct relationship with both" counsel]; *Aresh*, *supra*, 92 Cal.App.5th at pp. 306-307 [allowing an award awarding fees to one attorney to stand, but disallowing a decision in the action that stated the clients' rights to be paid specific funds because that ruling would impact the funds deemed available to pay another attorney].) To the extent defendants paid Gilliland all the funds due to her—thereby removing funds upon which the lien rested from the account—*they did so under Palmieri's direction and to meet the client's immediate needs as represented by Palmieri*. The duty to the client outweighed a

16

possible duty to Palmieri in this circumstance. "It is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his clients. . . . This loyalty should not be diluted by a duty owed to some other person, such as an earlier attorney." (*Mason v. Levy & Van Bourg* (1978) 77 Cal.App.3d 60, 66.)

For similar reasons, we find plaintiff's focus on *Mojtahedi v. Vargas* (2014) 228 Cal.App.4th 974 at oral argument to be unpersuasive. In *Mojtahedi*, the court affirmed a trial court decision sustaining a demurrer to a complaint brought by a prior counsel against a successor counsel to collect a portion of settlement checks deposited into the successor counsel's trust fund account because, "plaintiff failed to establish the existence, amount, and enforceability of his attorney fees lien in an independent action against the clients." (*Id.* at p. 976.) The court reasoned, in part, "[p]laintiff provided the services to the clients, not to defendant. If successful in a declaratory relief action regarding the reasonable value of his services, plaintiff's fees will be paid out of the clients' settlement proceeds. … Plaintiff must thus litigate with the clients to determine the reasonable cost of the services he provided to them. Plaintiff has omitted this essential step of establishing his entitlement to a particular portion of the settlement proceeds." (*Id.* at p. 978.) *Mojtahedi* does not consider whether successor counsel would somehow be required to pay prior counsel's quantum-meruit based lien after successor counsel distributes the full amount of clients' settlement proceeds to the client at the direction of prior counsel.

Finally, with respect to her reply brief, we find Palmieri's protestation that Rule 1.5.1(a) does not apply because this case does not involve a fee-splitting agreement does not give adequate weight to the policy considerations the trial court addressed in discussing the rule.

In *Chambers*, *supra*, 29 Cal.4th at pages 156-157, our Supreme Court explained the policy reasons for rules of professional conduct governing fee-splitting arrangements. First, *Chambers* quoted *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 903, to explain

17

that, with respect to pure referral fee agreements, " 'Just as a client has a right to know how his or her attorney's fees will be determined, he or she also has a right to know the extent of, and the basis for, the sharing of such fees by attorneys. Knowledge of these matters helps assure the client that he or she will not be charged unwarranted fees just so that the attorney who actually provides the client with representation on the legal matter has "sufficient compensation" to be able to share fees with the referring attorney. Disclosure of these matters to the client should be in writing because the client should not be expected to mentally retain such information throughout the pendency of the case.' (*Margolin*, *supra*, 85 Cal.App.4th at p. 903.) Moreover, '[r]equiring the client's written consent to fee sharing impresses upon the client the importance of his or her consent, and of the right to reject the fee sharing.' (*Ibid.*)" (*Chambers*, at pp. 156-157.)

Agreeing with *Margolin*'s stated purpose for fee splitting rules, *Chambers* extended that purpose to fee-splitting agreements that accompany the division of legal services to a client. (*Chambers*, *supra*, 29 Cal.4th at p. 157.) The Court said, "[a]s part of their professional obligations, attorneys are required to 'keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed.' [Citations.] A division of fees may reflect each participating attorney's responsibilities in a case or fees may be charged for multiple attorney participation in the case without regard to the particular services each attorney performs. Such information may affect the client's level of confidence in the attorneys and is indispensable to the client's ability to make an informed decision regarding whether to accept the fee division and whether to retain or discharge a particular attorney. As in the case of referral fees, requiring the client's written consent to fee divisions among participating attorneys impresses on the client the importance of consent and the right to reject a fee division." (*Ibid.*)

18

Here, when Palmieri joined ULC, when she left ULC, and as she continued to work on the Chase action, the defendants provided her ample opportunity to enter a fee sharing agreement with them to address her contributions to the Chase action. Such an agreement could have clarified her obligations and the extent to which the client's obligation to pay attorney fees would be impacted by that division of labor amongst counsel. Instead, after the Chase action settled, Palmieri asked defendants to distribute Gilliland's "share of the settlement . . . to [Gilliland] as soon as possible," and engaged in "coercive tactics" to "attempt to obtain a fee share much larger than she would have accepted earlier" under a fee splitting agreement. In so doing she, "threatened to report Sargetis to the State Bar," "exploited" the condition of an "elderly" client who was "in poor health," and "exposed Gilliland" to her claim for quantum meruit. The trial court found that when Palmieri pursued this course of conduct, "defendants acted in good faith in offering to address Palmieri's lien and *Palmieri did not*." (*Italics added.*)

In short, instead of entering into a fee agreement using a mechanism designed to protect the client's interests, Palmieri refused to negotiate in good faith, placed her client in the middle of her dispute with defendants, and opted to claim it was defendants who were breaching their fiduciary duties.

Basically, Palmieri's action here regarding fees attempts to avoid the requirements of Rule 1.5.1(a). That attempt necessarily fails. (See *Chambers*, *supra*, 29 Cal.4th at p. 162.)

Under these facts, given the inapposite support Palmieri provides, and considering Palmieri's failure to meaningfully challenge the underlying basis for the trial court's decision, we will affirm the trial court's judgment against her and in defendants' favor.

*III*

*Gilliland's Misrepresentation Claims*

Additional Background

The background Gilliland has supplied for this issue is scant. To the extent Gilliland believes we have missed a critical detail, that is an oversight of her own making. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must support any reference to a matter in the record with a citation to the record that includes volume and page number]; *Bains v. Moores* (2009) 172 Cal.App.4th 445, 454-455 (*Bains*).) Based on our review, in bringing a motion for summary adjudication on Gilliland's misrepresentation cause of action, defendants identified the allegations contained in the complaint and argued the misrepresentations alleged as a basis for the cause of action were protected by the litigation privilege contained in Civil Code section 47, subdivision (b). In opposing the motion, Gilliland did not provide additional allegations of misrepresentation by defendants.

As stated in the undisputed facts presented for the summary adjudication motion on this cause of action, the complaint alleged defendants committed misrepresentation when they stated—orally and in writing—that they would pay 20 percent of settlement funds to Palmieri, 20 percent to themselves, and then keep the rest in trust pending resolution of the fees dispute. Defendants also failed to disclose when they received the settlement funds.

Also, according to the undisputed facts, the complaint alleged that before Gilliland agreed to have ULC represent her, Foondos acknowledged Palmieri's lien based on her contingency agreement, and assured Gilliland he would reach an agreement with Palmieri or hold the fee in trust pending resolution of a fee dispute once a fee was collected in Gilliland's case. During these discussions, Foondos also told Gilliland and Palmieri that

20

Palmieri would receive a minimum of 20 percent of the fee, and that he would place an agreement to share the fees in writing.

Additionally, according to the undisputed facts, the complaint alleged that when Gilliland asked Foondos to put in writing a promise to give Palmieri a portion of the fee collected, he was insulted, said his word was good, and said Palmieri would be " 'fairly paid.' "

Finally, the undisputed facts state that according to the complaint, after the resolution of the Gilliland matter, Palmieri and Sargetis communicated regarding the division of attorney fees. After she proposed each party should receive 20 percent of the fee with the rest to remain in trust pending resolution, he responded, "OK as to 20 percent."

In their motion for summary adjudication on Gilliland's misrepresentation claim, defendants argued Gilliland could not satisfy the "misrepresentation" element of her cause of action for misrepresentation because the alleged misrepresentations as framed by the complaint were protected by the litigation privilege contained in Civil Code section 47, subdivision (b).

Relying on this court's decision in *Olsen, supra,* 191 Cal.App.4th 325, the trial court concluded Gilliland's misrepresentation cause of action was barred by the litigation privilege.

Standard of Review

"In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" ' (*Trop v. Sony Pictures Entertainment, Inc.*

21

(2005) 129 Cal.App.4th 1133, 1143 [], quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [].)

" 'On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. [Citation.] . . "[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed." [Citation.]' (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 [].)" (*Bains*, *supra*, 172 Cal.App.4th at pp. 454-455.)

The Litigation Privilege

Under Civil Code section 47, subdivision (b), a "privileged publication or broadcast is one made: [¶] . . . [i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as" not relevant here. When the Civil Code section 47, subdivision (b), privilege applies, "[t]he privilege is absolute and precludes a claimant from establishing a probability of prevailing on the merits of his claim." (*Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 780 (*Argentieri*).)

" 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' ([*Silberg v. Anderson* (1990) 50 Cal.3d 205,]

22

212.)  The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.'  (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057 [] (*Rusheen*).)"  (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).)  "To be privileged under section 47, a statement must be 'reasonably relevant' to pending or contemplated litigation."  (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266.)  For the litigation privilege to apply, the statement "must 'function as a necessary or useful step in the litigation process and . . . serve its purposes.'  [Citation.]"  (*Argentieri*, *supra*, 8 Cal.App.5th at pp. 785-786.)

"  ' "The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.  [Citations.]"  [Citation.]  In order to achieve this purpose of curtailing derivative lawsuits, we have given the litigation privilege a broad interpretation.'  (*Action Apartment*[, *supra*,] 41 Cal.4th [at p.] 1241 [].)  The privilege also encourages attorneys to protect their clients' interests, and is therefore 'extended to attorneys to protect them from the fear of subsequent derivative actions for communications made in the context of judicial proceedings.'  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 30[].)"  (*Olsen*, *supra*, 191 Cal.App.4th at p. 333.)

"The breadth of the litigation privilege cannot be understated.  It immunizes defendants from virtually any tort liability (including claims for fraud), with the sole exception of causes of action for malicious prosecution."  (*Olsen*, *supra*, 191 Cal.App.4th at p. 333.)

The privilege "applies to any publication or other communication required or permitted by law in the course of a judicial or quasi-judicial proceeding to achieve the objects of the litigation, whether or not the publication is made in the courtroom or in

23

court pleadings, and whether or not any function of the court or its officers is involved." (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1140 (*Rothman*).)

"Any doubt about whether the privilege applies is resolved in favor of applying it." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 913; *Greco v. Greco* (2016) 2 Cal.App.5th 810, 826.)

### The Trial Court Properly Applied *Olsen*

In *Olsen* a client signed a contingent fee agreement for plaintiff Olsen to represent her in a personal injury action. (*Olsen*, *supra,* 191 Cal.App.4th at p. 328.) Four years later, Olsen decided to associate defendant Harbison into the case. (*Ibid.*) Correspondence between Olsen and Harbison reflected they had reached an agreement as to a division of attorney fees, and the client signed an authorization for the division. (*Id.* at p. 329.) Shortly thereafter, the client fired Olsen and entered a new fee agreement with Harbison. (*Ibid.*) The client's case eventually settled, and plaintiff did not receive attorney fees. (*Ibid.*)

In a cause of action for fraud and deceit, Olsen's complaint alleged Harbison made representations to induce his association into the action and that Harbison (1) had no intention to perform on his promises, and (2) intended to collect all attorney fees while making Olsen cover any costs. (*Olsen*, *supra,* 191 Cal.App.4th at p. 332.) The trial court granted summary adjudication on the cause of action on the grounds that the subject communications came within the litigation privilege and, on appeal, this court found no error. (*Id.* at pp. 332-333.) In so doing, we looked at each of the four factors used in evaluating the litigation privilege. (See *id.* at p. 333.)

First, noting the underlying litigation on behalf of the client was the proceeding in which privileged communications may have occurred, we concluded the statements were made in the course of a judicial proceeding. (*Olsen*, *supra,* 191 Cal.App.4th at p. 334.) We explained that the comments that Olsen treated as fraudulent had been made after a

complaint was filed, and as part of Olsen's efforts to engage appropriate representation on the case at trial. (*Ibid.*) Here too, all the statements at issue were made after litigation began. Some of them were made as part of the parties' efforts to associate defendants in as counsel, others were made as the parties considered settlement terms, and still others were made as part of wrapping up the litigation and determining how to allocate amounts collected in the settlement. (See also *O'Keefe v. Kompa* (2000) 84 Cal.App.4th 130, 133-134 [stating the litigation privilege has been expanded to bar virtually all tort action based on any publication or broadcast and applying the privilege to post-trial efforts to secure an attorney fee judgment by levying a bank account and filing an abstract of judgment].)

Second, we rejected Olsen's argument that Harbison was not a participant in the litigation at the time he made the alleged representations. (*Olsen*, *supra*, 191 Cal.App.4th at p. 334.) We concluded that because the subject communications were linked to ongoing litigation and that Harbison's participation was imminent, Harbison satisfied the requirement that the statements be made by litigants or other participants authorized by law in the subject litigation. (*Id.* at pp. 334-335.) Here, the various statements were made by defendants either when they were planning to associate into the Chase action or once they were already counsel of record.

Finally, we rejected Olsen's argument that "the third and fourth elements of the litigation privilege were not met in that defendant's statements were not made to ' "achieve the objects of the litigation" ' and did not have ' "some connection or logical relation to the action." ' (*Action Apartment*[,] *supra*, 41 Cal.4th at p. 1241.)" (*Olsen*, *supra*, 191 Cal.App.4th at p. 335.) Olsen asserted the defendant's statements were unconnected to any litigation because they were made purely for economic self-interest. (*Id.* at p. 336.) While in finding this prong was met, we focused on the fact that the subject statements were made as part of an effort to bring in counsel to assist in the case, we find this reasoning applies to post-trial statements here as well. The amount of fees available in this action, who would pay them, when, and how were all tied to the terms of

25

settlement in the Chase action and the ultimate distribution of the award in that action. "Had there been no litigation, these comments would never have been made." (*Ibid.*)

### Gilliland's Arguments Are Without Merit

Gilliland's first argument appears to be that the trial court erred because it did not parse out the individual allegations of misrepresentation and rule on whether they were protected individually but instead, "lumped together 'all statements in the misrepresentation cause of action' even though some of these statements were made pre litigation, some post litigation, some by [defendants] to Gilliland and some to Gilliland's agent Palmieri."

The language Gilliand quotes from *Action Apartment* following her description of statements which were "lumped together" suggests the distinctions she attempts to make among them—whether they were before or after the litigation, and whether they were made to Gilliland or Palmieri—are not as significant as she implies: " ' "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants *or other participants authorized by law*; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." [Citation.] The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or *afterwards*." [Citation.]' " (*Action Apartment*, *supra*, 41 Cal.4th at p. 1241, italics added.)

Next, Gilliland argues the application of the litigation privilege to unidentified statements is improper. But the court did not apply the privilege to "unidentified" statements. It applied it to plaintiffs' allegations that defendants made specific misrepresentations at various points in their discussions regarding the terms of defendants' representation of Gilliland.

Finally, Gilliland argues that it was defendants' course of conduct that was tortious and that the related statements consistent therewith do not create immunity. We

26

disagree with this characterization of the allegations. "Because the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct was communicative or noncommunicative. [Citation.] The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. . . . That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen, supra,* 37 Cal.4th at p. 1058.) "[I]f the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct." (*Id.* at p. 1065.) As the name of the cause of action suggests, an essential element of a misrepresentation cause of action is misrepresentation. (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1252 [negligent misrepresentation]; *Molko v. Holy Spirit Assn.* (1988) 46 Cal. 3d 1092, 1108 [intentional misrepresentation].) Here, Gilliland has alleged oral and written communicative acts that constitute the misrepresentation. To the extent she has alleged other potentially tortious behavior that was contrary to those representations, the communicative acts remain essential to her claims.

To the extent Gilliland makes any arguments regarding this claim in her reply, we note they are all under the single header "Misrepresentation"—i.e., the arguments are not summarized in a header. (See Cal. Rules of Court, rule 8.204(a)(1)(B).) In any event, we find the cases cited therein inapposite and unpersuasive.

*IV*

*Gilliland's Damages and Constructive Trust Arguments*

Gilliland's arguments regarding damages and her constructive trust cause of action have been forfeited due to insufficient briefing.

In her opening brief, Gilliand identifies her damages argument with the header, "[t]he trial court erred in finding Gilliland is not damaged." Within the section, the first

27

legal authority she provides is to support a statement regarding an attorney's duty to third parties when he receives money on behalf of that party. That is, the statement says nothing about damages to a client.

The next two citations are used to support a paragraph that conveys (1) lawyers need to be competent and know laws regarding fee distribution among counsel, and (2) what Gilliland believes the law is regarding fee disputes. Again, these statements do not identify a form of damages or explain how a theory of damages applies to Gilliland.

Many paragraphs then follow in which Gilliland fails to cite controlling authority for the proposition that Gilliland suffered *damages* because of the alleged wrongdoing by defendants. In short, the legal support Gilliland offers for the argument in her opening brief is woefully insufficient and we do not consider those arguments.

Likewise, in her opening brief, Gilliland's argument under the header "Constructive Trust"—which does not summarize an argument—lacks a single legal citation.

The lack of legal citations in the opening brief contrasts with the reply brief, in which Gilliland offers various citations that purportedly support her position that there is a measure of damages available that the trial court ought to have found applied to find damages here. The reply brief's "Constructive Trust" argument is about four times as long as the argument made in the opening brief and contains some legal citations.

In her opening brief, Gilliland provided wholly unsupported arguments on these issues and we treat them as forfeited. To allow her to wait until her reply to muster legal authority that purportedly supports those arguments would unfairly deprive defendants of a meaningful opportunity to engage with those arguments. (*Starr*, *supra*, 83 Cal.App.5th at p. 854.)

For the same reason, Gilliland's efforts to interject an argument regarding the import of California Rule of Professional Conduct, Rule 1.15 at oral argument does not change our decision. First, we need not consider the applicability of Rule 1.15. If it is

28

"the controlling rule" and serves as the "fundamental premise" for this case, the time to acknowledge the rule was in Gilliland's opening brief. Second, any argument about ULC's fiduciary duty to Gilliland fails because Gilliland has not successfully made an argument that she is entitled to damages. To the extent the rule may have created an obligation for ULC to hold funds for Palmieri in trust, her fee would have been drawn from Gilliland's settlement proceeds (*Mojtahedi v. Vargas, supra,* 228 Cal.App.4th at p. 978 ["plaintiff's fees will be paid out of the clients' settlement proceeds"]), Palmieri instructed ULC to give Gilliland her settlement share, and ULC's duty to meet the needs of their client outweighed any obligation to Palmieri.

## DISPOSITION

The judgment is affirmed. Pursuant to California Rules of Court, rule 8.278(a)(1) and (5), costs shall be awarded to defendants from Palmieri in this appeal.

/s/
HULL, J.

We concur:

/s/
EARL, P. J.

/s/
MESIWALA, J.

29